IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ROSA I. PAGÁN-MALDONADO,

          Plaintiff

            v.

CENTENNIAL PUERTO RICO
COMMUNICATION CORP., et al.,

          Defendants

CIVIL NO. 09-1389 (JP)

## OPINION AND ORDER

Before the Court is Defendants Centennial Puerto Rico Operations Corp. (Incorrectly sued as "Centennial Puerto Rico Communication Corp.") ("Centennial"), Carlos Hernández, Ignacio Angulo and Angela Ramos' motion for summary judgment (**No. 62**), and Plaintiff Rosa Pagán-Maldonado's ("Pagán") opposition thereto (No. 67). Plaintiff brought the instant action pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.;* Puerto Rico Law 100 ("Law 100") of June 30, 1959, as amended, P.R. Laws Ann. tit. 29, § 146 *et seq.;* and Articles 1802 and 1803 of Puerto Rico's Civil Code, P.R. Laws Ann. tit. 31, § 5141. For the reasons stated herein, Defendants' motion for summary judgment is hereby **GRANTED.**

## I.    MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE

The following material facts were deemed uncontested by all parties hereto at the August 4, 2009, Initial Scheduling Conference (No. 45).

CIVIL NO. 09-1389 (JP)          -2-

1.   Plaintiff Pagán was born on April 21, 1959.  She is currently fifty years old.

2.   Plaintiff started working for Defendant Centennial on November 1, 1999, as a regular employee.

3.   In June 2000, Plaintiff applied and was given the position of Administrative Assistant for engineer Luis Carpena ("Carpena").

4.   In 2003, Plaintiff starting assisting Defendant Ignacio Angulo ("Angulo") but kept reporting to Carpena.

5.   In October 2007, Plaintiff was transferred to Centennial's IT Department.

6.   Kim Arroyo is younger than Plaintiff.

7.   In August 2008, Centennial posted a position for Executive Assistant, for which Plaintiff applied and was not selected.

8.   Plaintiff received a marginal evaluation from Defendant Carlos Hernández ("Hernández") for the fiscal year 2005-2006.

9.   Plaintiff has worked for Centennial since 1999 without any interruptions in her employment.

10.  Plaintiff is still a Centennial employee.

11.  Except for 2006, Plaintiff has received a merit salary increase in all of the years she has worked for Centennial.

CIVIL NO. 09-1389 (JP)            -3-

12. Plaintiff stopped participating in Centennial's Tuition Reimbursement benefit on or around June 2006.

13. Plaintiff was reinstated in Centennial's Tuition Reimbursement program on or around June 2007.

14. Throughout all periods relevant to this complaint, Plaintiff has been and today continues to be an Administrative Assistant at Centennial.

15. On July 29, 2008, Plaintiff filed a charge against Centennial, Carlos Hernández, and Ignacio Angulo before the Equal Employment Opportunity Commission ("EEOC") and the Puerto Rico Department of Labor's Anti-discrimination Unit ("ADU").

The following facts are deemed uncontested by the Court because they were included in the motion for summary judgment and opposition and were agreed upon, or they were properly supported by evidence and not genuinely opposed.

1. Centennial is a corporation dedicated to providing broadline and wireless communications services.

2. Co-defendant Angulo is and was during all periods relevant to this complaint, Centennial's Vice-President of Wireless Engineering. Angulo was born on July 31st, 1961, in Caracas, Venezuela.

3. Hernández is and was during all periods relevant to this complaint, Centennial's Auxiliary Vice-President of

CIVIL NO. 09-1389 (JP)           -4-

       Wireless  Engineering  &  Construction.   Hernández's birthdate is March 7, 1950.

4.   Co-defendant Angela Ramos-Jackson ("Ramos") is and was during  all  periods  relevant  to  this  complaint, Centennial's Human Resources Manager.  Ramos' birthdate is October 31, 1974.

5.   Centennial  has  always  had  personnel  policies  and procedures  that  ban  discrimination,  harassment  and retaliation in the workplace and establish several forums through  which  to  channel  these  types  of  complaints. Specifically, an employee can choose to file any complaint directly  with  his/her  direct  supervisor,  the  Human Resources Department, the Legal Department, Centennial's hot-line, directly with its President, Mr. Carlos Blanco, and/or  directly  at  Centennial's  parent  companies' corporate  offices  in  Wall,  New  Jersey.   Additionally, Centennial posts equal employment opportunity posters advising its employees of their rights under local and federal discrimination laws in its web portal, bulletin boards, employee lounges, cafeterias and other conspicuous places throughout their offices and establishments.  The policies  are  and  have  been  published  in  Centennial's Employee Manual and other separate documents.

CIVIL NO. 09-1389 (JP)              -5-

6.    On November 1, 1999, Pagán received copy of Centennial's Employee Manual 1996 Ed.  On May 16, 2007, Pagán received copy of Centennial's Employee Manual 2007 Ed.   On November 1, 1999, Pagán received copy of Centennial's Equal Employment Opportunity Policy.

7.    Throughout her employment at Centennial, Pagán has been aware that the company prohibits any type of discrimination including, but not limited to age, among others.  She has also been aware that Centennial provides several channels for presenting any type of grievance and investigates all grievances according to its policies.

8.    Pagán has also been aware that since 2004 Centennial has had a hotline through which she can present anonymous complaints.  She has admitted that she has not used it.

9.    During her tenure at Centennial, Pagán has never been terminated, suspended, or transferred out of her position of Administrative Assistant.  Further, her salary has not been reduced.  With the exception of 2006, where she attained a "marginal" rating in her yearly performance review, Pagán has received a "meets expectations" rating or higher in her yearly performance review and has received the corresponding pay raise every year in which she has worked for Centennial.

CIVIL NO. 09-1389 (JP)          -6-

10.  After being hired as a Receptionist and working as such
     since her enrollment, in June 2000, Pagán applied for and
     was selected for the position of Administrative Assistant
     in the Engineering Department.  In said capacity, she was
     under the direct supervision of engineer Carpena.

11.  Since Pagán's transfer to the Engineering Department
     in 2000, she has always received a quarterly bonus known
     in Centennial as the "Service Provider Bonus" ("SPB").
     The amount of this bonus varies from quarter to quarter
     depending on the financial situation of the Company.  The
     highest bonus she has received was for approximately
     $1,200.  Pagán received her most recent SPB payment in
     October 16, 2009 when Centennial paid out the SPB to all
     of its employees.

12.  Throughout all periods relevant to this complaint, Pagán
     has been and today continues work for Centennial as an
     Administrative   Assistant   at   Centennial   without
     interruptions.

13.  As  an  Administrative  Assistant,  Pagán  duties  and
     responsibilities   have   included,   among   others:
     (1) providing support to the Department she was assigned
     for;  (2)  scheduling  appointments  and  interviews;
     (3) making travel arrangements; (4) preparing and editing
     memos, letters, and Power Point presentations; (5) sending

CIVIL NO. 09-1389 (JP)          -7-

> e-mails and faxes; (6) conducting minor research by phone and the internet; (7) coordinating and following up meetings both internal and external; (8) keeping calendars; (9) working on special projects; (10) organizing and maintaining file systems; (11) filing correspondence and other records; (12) performing requisitions; and (13) answering phone calls, taking messages, and referring to the appropriate area.

14. An Administrative Assistant's salary is determined considering the salary scale applicable to the position, the employee's employment history, related required experience, required academic credentials, and the performance review ratings received while an employee of Centennial.   Salary raise percentages are assigned according to the rating an employee receives a performance review.

15. On September 10, 2007, Pagán was transferred to Centennial's IT Department.   Pagán's transfer to the IT Department made her feel very happy.   In said Department, she reported to Neftalí Cruz.   As an Administrative Assistant at Centennial's IT Department, Pagán also assisted Daniel Silvagnoli, Gannett Ramos, Fred Travis, Ivars Blums, and Gustavo Mauricio.

CIVIL NO. 09-1389 (JP)          -8-

16. Centennial performs yearly performance reviews to all of its employees. Centennial provides a yearly merit salary increase to all employees that attain a rating of "meets expectations" or higher in their yearly performance review.

17. Except for 2006, Pagán has received a merit salary increase in all the years she has worked for Centennial. In 2006, she did not receive a pay increase because she obtained a "Marginal" rating in her yearly performance review.

18. On June 1, 2001, Centennial granted Pagán a salary increase. Consequently, Pagán's salary was increased from $20,800.80 to $22,048.84.

19. On June 9, 2002, Centennial granted Pagán a salary increase. Consequently, Pagán's salary was increased from $22,048.84 to $24,958.96.

20. On June 9, 2003, Centennial granted Pagán a salary increase. Consequently, Pagán's salary was increased from $24,958.96 to $25,957.32.

21. On June 7, 2004, Centennial granted Pagán a salary increase. Consequently, Pagán's salary was increased from $25,957.32 to $26,930.00.

CIVIL NO. 09-1389 (JP)            -9-

22.   On June 6, 2005, Centennial granted Pagán a salary increase. Consequently, Pagán's salary was increased from $26,930.00 to $27,663.79.

23.   On June 4, 2007, Centennial granted Pagán a salary increase. Consequently, Pagán's salary was increased from $27,663.79 to $28,452.21.

24.   On June 1, 2008, Centennial granted Pagán a salary increase. Consequently, Pagán's salary was increased from $28,452.21 to $29,305.78.

25.   On June 1, 2009, Centennial granted Pagán a salary increase. Consequently, Pagán's salary was increased from $29,305.78 to $30,184.95.

26.   Until July 6, 2009 and up to that date, Centennial had thirteen (13) Administrative Assistants at Centennial. Seven (7) of them have a salary higher than Pagán's, while five (5) of them have salaries lower than hers.  Of the Administrative Assistants that have a higher salary, five (5) of them are over forty (40) years of age and, out of those five (5), four (4) of them are older than her. Finally, all of the Administrative Assistants that have a salary lower than Pagán's, are younger than her.

27.   The following is a table that presents all of Centennial's Administrative Assistants as of July 6, 2009, organized by

CIVIL NO. 09-1389 (JP)          -10-

hire date, which includes their age and salary as of that date:

| Name | Hired | Age | Salary | Position |
|------|-------|-----|--------|----------|
| Annie Resto-Mejías | 09/22/1997 | 51 | $34,959.69 | Administrative Assistant ("AA") |
| Gloria Reyes-Ferrer | 05/07/1998 | 48 | $33,926.88 | AA |
| Rosario Cortés-Rivera | 11/02/1998 | 58 | $35,526.94 | AA |
| María Martínez-Ramos | 07/07/1999 | 39 | $31,744.24 | AA |
| Rosa Pagán | 11/01/1999 | 50 | $30,184.95 | AA |
| Lucelián Vázquez-Cruz | 12/06/1999 | 40 | $28,184.02 | AA |
| Carmen Rivera-Rivera (rehire) | 01/08/2001 | 51 | $30,314.45 | AA |
| Elizabeth García-Hernández | 08/01/2001 | 55 | $33,475.00 | AA |
| Idalia Carrión-Algarín | 09/09/2003 | 46 | $26,877.43 | AA |
| Teresita Fraticelli-Carrión | 01/29/2007 | 34 | $28,479.08 | AA |
| Omayra Santa-Rivera (rehire) | 06/02/2008 | 39 | $28,322.41 | AA |
| Ana M. Ortiz-Torres | 09/15/2008 | 30 | $32,682.02 | AA |
| Christina Kauffman-Martínez | 11/10/2008 | 24 | $24,663.80 | AA |

28.  On July 29, 2008, Plaintiff filed a charge (the "Charge") against Centennial, Hernández and Angulo before the EEOC and the ADU.  Pagán's administrative claims are limited to

CIVIL NO. 09-1389 (JP)          -11-

an unspecified age related comments, one transfer to
another department and being substituted by younger
administrative assistants with a purportedly higher
salary, and having received a "Marginal" rating in her
2006 performance review.

29. Pagán did not include co-defendant Ramos as a respondent
in her charge.  She also did not allege that she was being
submitted to a hostile work environment because of her
age.

30. Kim Arroyo ("Arroyo") started working at Centennial as an
Executive Assistant on September 9, 2005.  Arroyo has
always been an Executive Assistant at Centennial.  She has
never occupied the position of Administrative Assistant.
As of the filing of this Statement, Arroyo is still a
Centennial employee.  She is currently 30 years old.

31. Arroyo has never substituted Pagán in any position.  They
occupy different occupational classifications.

32. The Executive Assistant position is a different, and a
higher ranked, position than the Administrative Assistant
position.  This is due to the fact that the Executive
Assistants report or have reported to higher ranked
executives within the organization, some of these, company
officials.  Due to this reporting structure and the level
of corporate authority and discretion related to these,

CIVIL NO. 09-1389 (JP)          -12-

this position requires a greater sense of discretion as well.   Also, the amount of experience and previous reporting structure within previous jobs expected for this position is greater than projected for an Administrative Assistant position.

33.  Pagán alleges that Arroyo substituted her before she (Pagán) was transferred to the IT Department in September of 2007.  Pagán has admitted that she was very happy and satisfied with her transfer to the IT Department.

34.  On July 2008, Centennial posted a position for Administrative Assistant in the Finance Department.  Pagán completed an internal application for this position.  The job posting includes a description of the position and the qualifications for the position.

35.  Zugeily Laracuente from the Human Resources Department and Rafael Otaño ("Otaño"), Centennial's Vice President in charge of the Finance Department interviewed Pagán for this position.   This position was within the same occupational classification that Pagán was occupying at the time, but in a different department and with different responsibilities.  The Administrative Assistant assigned to the Finance Department needed to have knowledge and prior experience handling financial reports and economic

CIVIL NO. 09-1389 (JP)          -13-

data, and would have to write and speak English.  When Pagán applied for the position, she was not aware of the salary that had been assigned to the position.

36. The job posting for the Administrative Assistant position Pagán applied for in the Finance Department states that, among the qualifications needed to occupy that position, the applicant should have a Bachelor's Degree in office administration and three (3) to five (5) years related experience, preferably in a Finance or Accounting firm work environment.  Also the position requires that the person performing the function is fully bilingual.

37. Pagán has admitted that she does not know who applied for the position, who was interviewed, their ages, their academic credentials or prior employment history, who selected the candidate the position, and/or the criteria that were considered to select a candidate for the position.

38. Christina Kauffman ("Kauffman") was selected to occupy the Administrative Assistant position at the Finance Department.  Kauffman writes and speaks English fluently, has a Bachelor's Degree in Accounting from the University of Puerto Rico and a 3.86 G.P.A.  Prior to enrolling at Centennial, Kauffman had worked one (1) year as Assistant to the Comptroller in Caribbean General Electric, and had

CIVIL NO. 09-1389 (JP)          -14-

worked as a summer intern in Pricewaterhouse Coopers, and E.I. Dupont De Nemours & Co. Kauffman is fully bilingual.

39. At the time she applied for the position, Pagán had obtained a Bachelor's Degree in Business from the University of Phoenix on October 31, 2006. One or two months after getting her Bachelor's Degree, Pagán started a Master's Degree at the University of Phoenix. Pagán attained a Masters in Business Administration (Technology Management) from the University of Phoenix on January 31, 2009.

40. From 1996 to 1998, Pagán worked as executive assistant of Casa de España in San Juan, PR. Pagán's résumé states that her work duties during at Casa de España were "Provide full administrative support to the company. Activity coordinator and administrative duties – handled all official company correspondence. Upgrade office filing system. Typed all department documents. Created a computerized customer database. Responsible for new employee training". According to the information provided in her resumé, Pagán does not have any prior finance related experience.

41. During her interview, Pagán had difficulties answering questions in English, made as part of the process to validate her skills in a second language. Likewise,

CIVIL NO. 09-1389 (JP)            -15-

during her deposition, Pagán stated that she does not speak English fluently. If selected, the transfer would have been considered a lateral movement since it is a similar position within the same occupational classification. In addition to her current responsibilities, Pagán would have to write and speak English, know and understand financial statements and reports and other economic data.

42. Otaño, together with Gloria Cruz Sánchez, Human Resources Vice-President and Zugeily Laracuente, selected Kauffman. The decision was based solely on the candidate's qualifications, impressive academic record, and the fact that Kauffman is fully bilingual.

43. Kauffman started working for Centennial on November 10, 2008. Kauffman's initial salary as Administrative Assistant was $24,259.04. On June 1, 2009, her salary was increased to $24,663.80. She resigned on July 10, 2009.

44. Pagán admitted that her salary claim was premised on what several Executive and Administrative Assistants told her about their compensation.

45. Pagán attained a "Marginal" rating in her fiscal year 2005-2006 performance review. Co-defendant Carlos Hernández was her supervisor at the time at Centennial's Engineering Department. Hernández consulted Pagán's

CIVIL NO. 09-1389 (JP)          -16-

performance review with Angulo prior to discussing the review with Pagán.  Co-defendant Angulo had preceded Hernández as Pagán's direct supervisor during a portion of the fiscal year under evaluation.  Angulo and Hernández agreed on the "Marginal" rating.  The rating was based on Pagán's attendance problems, low productivity, incomplete assigned tasks, and lack of innovation during the evaluation period.  Hernández discussed this performance review with Pagán on April 27, 2006.

46.  Pagán did not write any comments to her 2005-2006 evaluation.  However, on June 6, 2006, Pagán met with co-defendant Ramos to complain about the "Marginal" rating.

47.  As part of the investigation that ensued, Ramos relayed Pagán's dissatisfaction to Angulo and Hernández.  Angulo and Hernández justified Pagán's evaluation rating and provided evidence to support their findings.  Thus, on September 8, 2006, Ramos informed Pagán that the "Marginal" rating remained.

48.  Pagán attained a "Fully Meets" rating in her fiscal year 2006-2007 performance review.  Hernández was responsible for evaluating Pagán at the time.  He discussed this performance review with Pagán on May 16, 2007.

CIVIL NO. 09-1389 (JP)              -17-

49. On her fiscal year 2007-2008 performance review, Pagán attained a "Fully Meets" rating in her performance review. Neftalí Cruz supervised her during that time.   Neftalí Cruz discussed this performance review with Pagán on April 29, 2008.

50. On her fiscal year 2008-2009, Pagán attained a "Fully Meets" rating in her performance review.   Iván Somavilla ("Somavilla"), Auxiliary Vice-President of Sales, was her direct supervisor during the evaluation period.   Somavilla discussed this performance review with Pagán on May 9, 2009.

51. Centennial provides its employees a Tuition Reimbursement Program ("Program") whereby the Company reimburses 75 percent of their tuition costs in an accredited institution, if the employee complies with the requirements to participate in the Program.   To be eligible to participate in this Program the employee has to, among other requirements: (1) demonstrate a satisfactory work performance during the year immediately before the tuition reimbursement is requested; and (2) the academic degree pursued is relevant to the employee's position at Centennial.

52. The terms and conditions of the Program are available to all interested employees in a written policy.   Pagán has

CIVIL NO. 09-1389 (JP)          -18-

been aware of Centennial's Tuition Reimbursement Policy during all relevant periods.

53. Pagán started participating in the Program and Centennial started reimbursing her tuition costs in October 11, 2004. She continued participating in the Program until June of 2006 when she received a "Marginal" rating in her performance review for fiscal year 2005-2006. As stated by the Policy, the "Marginal" rating made her ineligible to participate in the Program. Consequently, Pagán's tuition reimbursement requests were declined.

54. Plaintiff was reinstated in Centennial's Tuition Reimbursement Program on or around June of 2007.

55. She was reinstated in the Program after she received a "Fully Meets" rating in her fiscal year 2006-2007 performance review.

56. With the exception of the period beginning June of 2006 and ending on June of 2007, Centennial reimbursed Pagán 75 percent of her total tuition for her Bachelor's Degree and MBA from the University of Phoenix, in accordance with Centennial's Tuition Reimbursement Program.

57. Axel Hernández was an Engineer at Centennial. He never supervised Pagán. He was not mentioned in the Charge, no allegations about his conduct were presented in the charge, and he was not included as a party in this case.

CIVIL NO. 09-1389 (JP)            -19-

58. According to Pagán, she had several problems with Alex
    Hernández.  She alleges that he made unspecified age
    related comments and comments about her intellectual
    capacity.  Pagán has admitted that her problems with Alex
    Hernández ended when she filed a complaint against him
    with co-defendant Ramos on February 14, 2007.

59. On February 14, 2007, Pagán met with Ramos to present a
    complaint against Axel Hernández.  She alleged that he had
    allegedly made comments regarding Pagán's age and
    intellectual capacity.

60. The day before Pagán presented her complaint against Alex
    Hernández (February 13, 2007), Pagán was admonished for
    not processing certain checks.  Pagán was admonished as
    the result of a complaint Alex Hernández made about her
    lack of proactiveness in processing checks that the
    Engineering Department needed to obtain certain permits
    with the Puerto Rico government.

61. Ramos investigated the complaint filed by Pagán.

62. On February 28, 2007, Ramos prepared a letter informing
    Pagán the results of her investigation.  In her letter,
    Ramos stated that, as part of the investigation, she
    interviewed Axel Hernández and the individuals Pagán had
    identified as witnesses of Alex Hernández's conduct
    towards her.  She stated that Hernández had denied the

CIVIL NO. 09-1389 (JP)          -20-

allegations.  Further, she stated that the persons Pagán
had identified that may have knowledge of the incident had
denied having heard any of the comments in Pagán's
complaint.  At the end of her letter, Ramos advised Pagán
that "although we were not able to verify the information
that you have presented, we had a conversation with
Mr. Hernández and warned him that the conduct and comments
allegedly made by him are not appropriate, do not create
a good work-environment, and are not tolerated by
Centennial".  Pagán received copy of the February 28, 2007
letter.

63.   On February 28, 2007, Ramos had separate meetings with
Axel Hernández and Pagán to discuss the results of the
investigation.

64.   Pagán did not object to Ramos' findings as stated on the
February 28, 2007 letter.  Further, she did not present
any other complaints either internally or externally
related to Alex Hernández's conduct after her
February 2007 complaint.

65.   On September 28, 2004, Pagán's former supervisor in
Centennial's Engineering Department, Carpena, and
Lissette Márquez ("Márquez"), Ramos' predecessor as
Employee Relations Manager, met with Pagán to discuss a
complaint presented against her associated with an

CIVIL NO. 09-1389 (JP)          -21-

incident regarding an employee survey which Pagán had been asked to distribute to a certain group of Centennial employees. The employee survey is a tool Centennial uses to measure the employees' satisfaction with their supervisor's performance. The complainant alleged that Pagán would ask the employees to take advantage of the survey to "nail their bosses" ("Clavarse a los jefes") while distributing the surveys.

66. On October 4, 2004, Pagán sent a letter to Arnaldo Rodríguez-Yumet ("Rodríguez-Yumet"), then Centennial's Human Resources Vice President alleging that she felt harassed as the result of her meeting with Carpena and Márquez.

67. On October 8, 2004, Rodríguez-Yumet answered Pagán's letter. In his response, he clarified that the meeting was conducted as part of an internal investigation stemming from a complaint about comments made by her and reminded Pagán of the seriousness of the allegations made against her. He also stated that Pagán never denied having made the alleged comments and provided her a copy of her statement to support that finding. Finally, he denied Pagán's harassment allegation and reminded her that she had not been disciplined for her still undenied comments.

CIVIL NO. 09-1389 (JP)          -22-

68. Pagán did not respond to Rodríguez-Yumet's answer to her October 4, 2004, letter or challenge the statements made therein in any way.

69. On or around February of 2009, Pagán had an incident with her current supervisor, Somavilla.  Specifically, Pagán entered Somavilla's office while he was in a meeting with Juan Díaz and Luis de Jesús, two of Centennial's Sales Directors that reported to Somavilla and interrupted the meeting.  She then told Somavilla: "Look, Ivan, when you are going to leave, let me know because I cannot see your calendar".  After reprimanding Somavilla for not informing her of his whereabouts, Somavilla allegedly hit the table, and responded that "he does not have to inform her where he was because that was not her problem".  Pagán alleges that Somavilla asked her to leave the office and slammed the door when she left.

70. After the incident, Pagán visited the Human Resources Department and informed Leslie Vélez ("Vélez"), Centennial's Labor Relations Specialist II, and Gloria Cruz ("Cruz"), Centennial's Vice President of Human Resources, what had happened and stated that she was leaving for the day because she was not feeling well. Centennial accepted her request.

CIVIL NO. 09-1389 (JP)          -23-

71. After listening to Pagán's account, Cruz and Vélez immediately investigated the situation. As part of the investigation they met with Juan Díaz, Luis de Jesús, and Somavilla. The investigation revealed that both Somavilla and Pagán were responsible for the incident. Pagán was partially responsible for the incident she provoked when she interrupted Somavilla's meeting and reprimanded him in front of two of his direct reports. Her tone of voice was very demanding according to what Somavilla explained. Further, she interrupted his meeting for something that was not urgent and the manner and tone in which she spoke to Somavilla in front of his direct reports was not acceptable.

72. Somavilla did not make any comments related to Pagán's age during this incident.

73. On or around August 2009, Edwin Stevenson, Senior Vice-President of Sales, asked Pagán to leave a meeting he was having with the sales force. Cruz was one of the attendants to said meeting. Cruz personally requested that Pagán be excused from the meeting. The reason for excusing Pagán was that the sales force would be notified of the involuntary termination of a member of its management. Thus, since Pagán was not a seller, her presence was not required at that time in the meeting.

CIVIL NO. 09-1389 (JP)          -24-

74. During the first half of 2009 and in contemplation of the potential acquisition of Centennial by AT&T, Centennial sent a letter to several employees offering them a retention bonus.  This letter was delivered to employees that were considered critical to the continuation of the business during its transfer to AT&T.  The employees that were not deemed "critical" received a separate letter offering them a $1,000.00 bonus.  As of the filing of this motion, these bonuses have not been paid because the contemplated transaction has not occurred.

75. Centennial offered Pagán a $1,000.00 retention Bonus on April 8, 2009.

76. Pagán has admitted that she has no evidence that establishes the identity of the employees that would receive the retention bonus and those that would receive the $1,000.00 bonus.

77. Excluding some management employees, Centennial does not pay any discretional annual bonus to its non-exempt employees.

78. After her 2005-2006 evaluation, Pagán began keeping notes of her work in a notebook.  She also includes the important assignments given to her by her supervisors. She still uses that notebook and keeps it with her most of the time.

CIVIL NO. 09-1389 (JP)          -25-

79. On July 8, 2008, Pagán received a copy of a document titled "Business Solutions Objectives".  This document states the  administrative and logistical objectives and tasks assigned to the Administrative Assistants  in the Business Solutions Department for 2008.

80. From August 2008 until today, Pagán has been the only Administrative  Assistant  assigned  to  the  Business Solutions Sales Department.  As such, Pagán is responsible for answering the phones, providing support to the sales team, and assisting the sales force.

81. Pagán has performed all of her duties as an Administrative Assistant at Centennial before and after she filed her administrative charge and the above captioned complaint.

## II.  **LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT**

Summary judgment serves to assess the proof to determine if there is a genuine need for trial.  Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990).  Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Zambrana-Marrero v. Suárez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999)

CIVIL NO. 09-1389 (JP)          -26-

(stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993); Canal Ins. Co. v. Benner, 980 F.2d 23, 25 (1st Cir. 1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. See Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989).

On a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. See Anderson, 477 U.S. at 248; Celotex, 477 U.S. at 324; Goldman, 985 F.2d at 1116.

CIVIL NO. 09-1389 (JP)            -27-

III. **ANALYSIS**

Defendants argue that summary judgment is appropriate because Plaintiff has failed to meet her burden under the ADEA for her age discrimination and retaliation claims.  Also, Defendants argue that the Court should dismiss Plaintiffs' Puerto Rico law claims if the Court dismisses the federal claims.  The Court will now consider Defendants' arguments in turn.

A. **Individual Liability Under ADEA**

In the complaint, Plaintiff brings claims against Hernández, Angulo and Ramos.  As stated in the uncontested facts, these Defendants are part of Centennial's management.  Defendants argue that no liability attaches to these individual Defendants under the ADEA.  Plaintiff does not oppose this argument by Defendants.[1]  The Court concludes that, under the ADEA, only the employer is liable for the acts of its agents and, therefore, individual liability does not apply in the ADEA claims.  E.g., Díaz v. Antilles Conversion & Export, Inc., 62 F. Supp. 2d 463, 465 (D.P.R. 1999).  As such, any claims under the ADEA against said Defendants will be dismissed with prejudice.

B. **Age Discrimination**

Under the ADEA, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms,

---

1. However, Plaintiff does argue that there is individual liability for the claims under Puerto Rico Law.

CIVIL NO. 09-1389 (JP)          -28-

conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  To prevail in a suit under the ADEA, the plaintiff's age has to play a role in the employer's decision making process.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000).

To establish a prima facie case of age discrimination, a plaintiff must produce evidence that: (1) he/she was at least forty years old; (2) his/her job performance met the employer's legitimate expectations; (3) the employer subjected him/her to an adverse employment action; and (4) the employer sought a replacement with roughly equivalent job qualifications, thus revealing a continued need for the same services and skills. Acevedo-Martínez v. Coatings Inc. and Co., 251 F. Supp. 2d 1058, 1066 (D.P.R. 2003).

If and when plaintiff demonstrates his/her prima facie case, the burden of production shifts to the defendant to articulate "a legitimate, nondiscriminatory basis" for the adverse employment action defendant took against plaintiff. González v. El Día, Inc., 304 F.3d 63, 68-69 (1st Cir. 2002).  If defendant is able to articulate a legitimate, non-discriminatory reason, the presumption afforded to the plaintiff's prima facie case disappears and the plaintiff must provide sufficient evidence that age was a motivating factor in the challenged employment action.  Id. at 69.  In the instant motion, Defendants argue that Plaintiff has failed to develop evidence from which a jury could find a prima facie case of age

CIVIL NO. 09-1389 (JP)          -29-

discrimination because she has failed to raise a genuine factual controversy as to elements two, three and four.

### 1.   Age of Plaintiff

In the instant case, Plaintiff Pagán meets the age element because it is undisputed that she is over forty years old.  Hoffman v. Applicators Sales & Service, Inc., 439 F.3d 9, 17 (1st Cir. 2006).

### 2.   Employer's Legitimate Expectations

Plaintiff Pagán argues that she has met the legitimate expectations of Centennial because she has consistently performed her job to Centennial's expectations.  To support her claim, Plaintiff relies on her yearly evaluations in which, with the exception of fiscal year 2005-2006, she has always received "meets expectations."  Defendants argue that Centennial's legitimate expectations have not been met because Plaintiff received a "marginal" rating in her fiscal year 2005-2006 evaluation.  After considering the evidence, the Court determines that there is sufficient evidence for a jury to conclude that Plaintiff Pagán has met Centennial's legitimate expectations.

### 3.   Adverse Employment Action

Plaintiff argues that she suffered adverse employment actions when:  (1)  she  was  transferred  from  assisting  Angulo  in  the Engineering  Department  to  assisting  the  IT  Department;  and (2) Kauffman, twenty-four years old, was hired instead of Plaintiff, fifty-two years old, for the Administrative Assistant position in the Finance Department.

CIVIL NO. 09-1389 (JP)          -30-

     To be adverse, an employment action must materially change the
conditions  of  plaintiff's  employment.   Gu  v.  Boston  Police
Department, 312 F.3d 6, 14 (1st Cir. 2002).  Some material changes
include  "demotions,  disadvantageous  transfers  or  assignments,
refusals  to  promote,  unwarranted  negative  job  evaluations,  and
toleration of harassment by other employees."  Id.

     After  considering  the  evidence,  the  claim  that  Plaintiff
suffered  an  adverse  action  because  she  was  transferred  from  the
Engineering Department to the IT Department is unavailing.  Plaintiff
bases  her  claim  on  Nelson  v.  University  of  Maine  System,
923 F. Supp. 275, 281 n.6 (D.Me. 1996).  That case is inapplicable.
In  said  case,  the  Court  stated  "even  lateral  transfers,  without  a
reduction  in  pay  or  benefits  can  constitute  an  adverse  employment
action  if  the  employer  relocates  an  employee  to  an  *undesirable*
location."  Id. (emphasis added).  While there was a lateral transfer
here,  Plaintiff's  argument  fails  because  there  was  no  undesirable
transfer. The undisputed facts establish that Plaintiff was happy and
satisfied with the transfer to the IT Department.  Furthermore, said
transfer  was  not  a  demotion  as  Plaintiff  maintained  the  same
position, but in a different department.  As such, Plaintiff cannot
claim that said transfer was an adverse employment action.

     In  regards  to  the  hiring  of  Kauffman  instead  of  Plaintiff,
Plaintiff  argues  that  her  denial  for  the  position  constituted  an
adverse  action  because  it  was  a  failure  to  promote.   However,

CIVIL NO. 09-1389 (JP)          -31-

Plaintiff has failed to point to any evidence that the position constituted a promotion.  The uncontested facts show the exact opposite.  The position that Pagán was denied was that of an Administrative Assistant in the Finance Department.  Said position falls within the same occupational classification as the position occupied by Pagán at that time, but in a different department.  Based on this evidence, Plaintiff cannot allege an adverse action based on failure to promote.  Accordingly, the Court finds that Plaintiff has failed to meet the third element of her prima facie case of age discrimination.

### 4.   Continued Need for the Same Services and Skills

Plaintiff argues that Centennial had a continued need for the services and skills brought by Plaintiff Pagán because Arroyo and Kauffman had roughly the same qualifications.  The Court notes that, in her opposition to the motion for summary judgment, Plaintiff failed to provide or point to any evidence: (1) that there was a continued need for the services and skills brought to the table by Pagán; and (2) that Pagán had roughly the same qualifications as Arroyo and Kauffman.  Specifically, Plaintiff stated "[i]t is clear that Centennial sought a replacement with roughly equivalent job qualifications, thereby allowing [Plaintiff Pagán] to meet the fourth element of her prima facie case." While the Court should draw all reasonable inferences in favor of the nonmoving party, mere conclusory allegations without factual support are insufficient to

CIVIL NO. 09-1389 (JP)          -32-

survive summary judgment.  Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008); Daury v. Smith, 842 F.2d 9, 11 (1st Cir. 1988) (quoting Pérez de la Cruz v. Crowley Towing & Transportation Co., 807 F.2d 1084, 1086 (1st Cir. 1986)).

     Furthermore, the undisputed facts clearly show the opposite of what Plaintiff contends.  In regards to the denial of her application for the position of Administrative Assistant in the Finance Department, the uncontested facts are that, in July of 2008, Centennial posted the position of Administrative Assistant in the Finance Department and that Plaintiff Pagán applied for said position.  The job posting included a description of the position and the qualifications for the position.  The position required the Administrative Assistant to: (1) have knowledge and prior experience handling financial reports and economic data; and (2) write and speak in English.

     Kauffman was selected for the position.  She writes and speaks English fluently, has a Bachelor's Degree in Accounting and 3.86 G.P.A.  Also, prior to coming to Centennial, she had previously worked as assistant to the Comptroller of Caribbean General Electric and interned at Pricewaterhouse Coopers.  Plaintiff Pagán, on the other hand, does not have any prior finance related experience according to her resume.  Moreover, Pagán is not fluent in English.  Specifically, during her interview for the position in the Finance Department, Pagán had problems responding to questions in English.

CIVIL NO. 09-1389 (JP)          -33-

Likewise, during her deposition, Pagán stated that she does not speak English fluently.  As such, Plaintiff Pagán cannot argue that she had similar qualifications to Kauffman because she lacked both financial experience and fluency in English.  Both of which were requirements for the position Plaintiff applied for.

Also, in regards to the claims that Plaintiff was replaced by Arroyo in the Engineering Department, Plaintiff's argument fails immediately as it is undisputed that Arroyo never substituted Plaintiff Pagán in any position.  They occupy different occupational qualifications.  Plaintiff Pagán is an Administrative Assistant while Arroyo is an Executive Assistant.  The Executive Assistant position is a different, and higher ranked, position than the Administrative Assistant position.  Executive Assistants tend to report to higher executives within the corporation including some company officials. Because Arroyo was brought in to fill a different position than that of Plaintiff Pagán, Plaintiff cannot show that there was a continued need for her services and skills.  Plaintiff therefore has not raised a genuine factual issue as to the fourth element for a prima facie case of age discrimination.

Because Plaintiff has not developed evidence creating at least a genuine factual controversy as to the third and fourth elements of her prima facie case, the Court determines that summary judgment on said claim is appropriate.  Accordingly, the Court will dismiss Plaintiff's age discrimination claim under the ADEA.

CIVIL NO. 09-1389 (JP)          -34-

   **C.    Retaliation**

     Under the ADEA, an employer may not discriminate against an
employee on the basis that the employee has opposed any employment
practice made unlawful by the statute.  29 U.S.C. § 623(d).  To make
out a prima facie case of retaliation, an employee must show that
he/she engaged in a protected activity and that the employee suffered
an adverse employment action as a result of his/her participation in
said activity.   Bennet v. Saint-Gobain Corp., 507 F.3d 23, 32
(1st Cir. 2007).  This requires an employee to make a showing of a
causal connection between his/her protected activity and an adverse
employment action.   Benoit v. Technical Manufacturing Corp.,
331 F.3d 166, 175 (1st Cir. 2003) (citing Wyatt v. City of Boston,
35 F.3d 13, 15 (1st Cir. 1994)).

     Plaintiff alleges that she has met her burden because, when she
engaged in the protected action of filing the administrative charge,
Defendant Centennial left Plaintiff Pagán without duties, moved
Plaintiff to another work location where she could barely fit and was
facing a wall, and did not offer the retention bonus to Plaintiff.

     Like the argument presented by Plaintiff regarding the fourth
element of the prima facie case for age discrimination, Plaintiff's
argument of retaliation fails because she has again made conclusory
allegations without any factual support.  Plaintiff has failed to
present the Court with any evidence that she was left without duties,
or that she was moved to a work location where she could barely fit

CIVIL NO. 09-1389 (JP)          -35-

and was facing the wall.  As such, her unsupported conclusory allegations cannot survive summary judgment.  <u>Prescott v. Higgins</u>, 538 F.3d 32, 39 (1st Cir. 2008); <u>Daury v. Smith</u>, 842 F.2d 9, 11 (1st Cir. 1988) (quoting <u>Pérez de la Cruz v. Crowley Towing & Transportation Co.</u>, 807 F.2d 1084, 1086 (1st Cir. 1986)).

Furthermore, the undisputed evidence demonstrates that Plaintiff cannot succeed in her retaliation claim.  First, it is undisputed that Plaintiff Pagán had duties after she engaged in the protected activity of filing the administrative charge. As the Administrative Assistant of the Business Solutions Department, Plaintiff continued performing her duties of answering phones, providing support to the team, and assisting the sales force.

The allegation pertaining to the retention bonus refers to a letter sent to several Centennial employees deemed "critical" offering them a retention bonus in anticipation of AT&T's acquisition of Centennial.  No bonuses have been paid since said acquisition has not occurred.  Employees deemed non "critical" by Centennial, such as Pagán, were offered a $1,000.00 retention bonus.

Plaintiff Pagán argues that she was not offered the bonus for "critical" employees because of her filing of the administrative charge.  Plaintiff's argument fails for two reasons.  First, the Plaintiff cannot claim an adverse action has been taken against her since it is undisputed that the retention bonuses have not been paid out.  Also, even if there was an adverse action, Plaintiff Pagán's

CIVIL NO. 09-1389 (JP)         -36-

claim fails because she has not pointed to any facts to establish that she was not deemed a "critical" employee and therefore not offered the bonus because of her filing the administrative charge. Thus, she has failed to show the causal link between the adverse action and the protected activity.  <u>Benoit</u>, 331 F.3d at 175.  The Court therefore concludes that Plaintiff has failed to present evidence sufficient to support a prima facie case for retaliation. Accordingly, the Court will grant summary judgment and dismiss the Plaintiff's retaliation claims with prejudice.

      **D.**   **<u>Puerto Rico Law Claims</u>**

      Plaintiff also bring claims arising under Puerto Rico law, specifically Puerto Rico Law 100 ("Law 100") of June 30, 1959, as amended, P.R. Laws Ann. tit. 29, § 146 *et seq.*; and Articles 1802 and 1803 of Puerto Rico's Civil Code, P.R. Laws Ann. tit. 31, § 5141.

      Dismissal of pending state law claims is proper because an independent jurisdictional basis is lacking. Exercising jurisdiction over pendent state law claims once the federal law claims are no longer present in the lawsuit is discretionary.  <u>See</u> <u>Newman v. Burgin</u>, 930 F.2d 955, 963 (1st Cir. 1991) (holding that "[t]he power of a federal court to hear and to determine state-law claims in nondiversity cases depends upon the presence of at least one 'substantial' federal claim in the lawsuit . . . [and] the district court has considerable authority whether or not to exercise this

CIVIL NO. 09-1389 (JP)              -37-

power, in light of such considerations as judicial economy, convenience, fairness to litigants, and comity[]").

In the instant case, the Court chooses not to hear the state law claims brought by Plaintiff.  Therefore, the Court will dismiss the state law claims without prejudice.

**IV.   <u>CONCLUSION</u>**

In conclusion, the Court **GRANTS** Defendants' motion for summary judgment.  The Court will enter a separate judgment dismissing the complaint.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 7th day of December, 2009.


                                      s/Jaime Pieras, Jr.
                                  JAIME PIERAS, JR.
                              U.S. SENIOR DISTRICT JUDGE